FILED

03/31/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 17-0470

DA 17-0470

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 73

STATE OF MONTANA,

      Plaintiff and Appellee,

    v.

EMMANUEL F. GOMEZ,

      Defendant and Appellant.

APPEAL FROM:     District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 16-17
Honorable Karen S. Townsend, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Robin Meguire, Attorney at Law, Great Falls, Montana

      For Appellee:

      Timothy C. Fox, Montana Attorney General, Brad Fjeldheim, Assistant
Attorney General, Helena, Montana

      Kirsten H. Pabst, Missoula County Attorney, Missoula, Montana

Submitted on Briefs:  January 8, 2020

Decided:  March 31, 2020

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Emmanuel F. Gomez appeals from the February 6, 2017 verdict of a Missoula County jury, finding him guilty of one count of Partner or Family Member Assault (PFMA), a misdemeanor violation of § 45-5-206(1)(a), MCA, and one count of Deliberate Homicide, a felony violation of § 45-5-102, MCA. Gomez raises the following issues on appeal:

> *1. Whether the District Court properly denied Gomez's motion to sever the counts;*
>
> *2. Whether the District Court abused its discretion when it excluded evidence of the victim's drug use and denied Gomez's motion for a new trial;*
>
> *3. Whether the District Court abused its discretion admitting numerous out-of-court statements from the deceased victim; and*
>
> *4. Whether Gomez is entitled to a new trial due to cumulative error.*

¶2 We affirm.

### PROCEDURAL AND FACTUAL BACKGROUND

¶3 On January 13, 2016, the State charged Gomez with one count of PFMA as a continuing course of conduct from January 1, 2015 through December 20, 2015, and one count of deliberate homicide. Police arrested Gomez on December 24, 2015, for PFMA after Charlie Wyrick was reported missing. After a four-day search, Wyrick's frozen body was found down a steep ravine off the side of the road in Pattee Canyon on December 27, 2015. She had a single stab wound to the chest. During an interrogation on December 28, Gomez told detectives Wyrick's death was an accident.

2

¶4 Gomez filed numerous pretrial motions, including a motion to suppress his pretrial confession, a motion to admit defense expert testimony regarding Gomez's state of mind at the time of the crime, a motion to sever the two counts, a motion to admit evidence of the victim's methamphetamine use, and a motion to exclude hearsay statements made by the victim. Given his prior confession to detectives, Gomez indicated he would be pursuing an accident defense in his pretrial motions. All of Gomez's pretrial motions were argued based on an accident defense.

¶5 The court addressed each of Gomez's pretrial motions. First, determining Gomez failed to meet his burden to demonstrate prejudice from their joinder, the court declined to sever the charges. Regarding Gomez's motion to allow expert testimony from a mental health evaluator, opining on his state of mind at the time of Wyrick's death, the court determined that it would allow his evaluator to testify concerning her evaluation and diagnosis of Gomez, but she could not testify about whether Gomez acted with purpose or knowledge at the time of Wyrick's death. Further, the court instructed that the evaluator could not provide the jury with Gomez's explanation of Wyrick's stabbing and its aftermath. Next, the court suppressed Gomez's pretrial confession, determining officers violated Gomez's Fifth Amendment rights by interrogating Gomez on December 28 without the presence of counsel after Gomez had previously invoked his right to counsel when detectives interrogated him about Wyrick's whereabouts on December 24. The court, however, determined the State could use Gomez's statement as impeachment evidence if Gomez took the stand.

3

¶6 In response to Gomez's motion to exclude hearsay testimony from the victim, the State supplied the court with a spreadsheet outlining over one hundred out-of-court statements from Wyrick it intended to elicit from its witnesses. At a brief hearing to discuss the proffered testimony, both parties agreed the District Court would need to wait until trial to rule on Gomez's individual objections in the context of the testimony elicited. In a pretrial order, the District Court outlined the framework it would use to rule on hearsay objections during trial. Finally, on the day before trial, the court issued its order, denying Gomez's motion to admit evidence of the victim's methamphetamine use. The court explained the victim's drug use was not a pertinent character trait and as such, the evidence was improper character evidence and its probative value was substantially outweighed by the danger of unfair prejudice.

¶7 The State called thirty-nine witnesses at trial, including various friends and family members of Wyrick, Wyrick's coworkers, six medical professionals, four of Gomez's roommates and a roommate's girlfriend, officers and detectives involved in the case, as well as the medical examiner who performed the autopsy, two lab technicians who tested blood recovered from Gomez's house and vehicle, and a records custodian from AT&T. During trial, Gomez's counsel indicated Gomez may pursue any of several different defenses including Wyrick's death was an accident, someone else was involved in her killing, or the State failed to meet its burden of proof. In the end, the defense closed without putting on any additional evidence and argued the State had failed to prove beyond a reasonable doubt that Gomez had deliberately killed Wyrick.

4

¶8 At trial multiple friends, family, and coworkers of Wyrick testified she first began dating Gomez sometime in early 2015. They recounted that after she began dating Gomez, she regularly had bruising on her face, neck, and arms, and she had bald patches on her head, like chunks of her hair had been pulled out. Longtime friends and a cousin explained that as Wyrick's relationship with Gomez progressed, her contact with them substantially decreased or ceased altogether. They described Wyrick as withdrawn and depressed after she started dating Gomez. Maghan Radcliff, the girlfriend of Wyrick's brother Maxwell Straight, explained Wyrick was happy and bubbly when she first met her, but this changed when she was around Gomez. Radcliff described one incident during the summer of 2015 in which she picked Wyrick up to go shopping and a white Toyota Avalon, which she identified as one of Gomez's two vehicles, followed them. She explained this occurred at a time when Wyrick and Gomez were briefly broken up. She pulled into a gas station to lose the vehicle. Later in the day, the same vehicle reappeared. She zigged and zagged trying to lose the vehicle again.

¶9 Karen Fairclough, the store manager at Pattee Creek Market, testified she hired Wyrick to work in the deli of Pattee Creek Market on September 12, 2015. Fairclough noted that over the three months Wyrick worked at the market, her demeanor changed, and she became quieter and kept to herself more. Other coworkers noted Wyrick's demeanor would change when Gomez came into the store. The deli supervisor Steven Weare testified Gomez would hang around the market from time to time but would never interact with anyone but Wyrick. He noticed Gomez hanging around especially on paydays. As soon

5

as paychecks were available, Wyrick would take a break and leave with Gomez, even if she had just started her shift. He thought Wyrick seemed anxious when Gomez was in the store, especially on paydays.

¶10 Fairclough and Weare testified Wyrick missed work at the end of October because she had a concussion. Wyrick informed Fairclough she had fallen down some steps. Wyrick told another coworker she had fallen in the driveway and a third coworker she had slipped on some ice. Multiple coworkers testified they saw Wyrick with a black eye. Wyrick visited the emergency room for her head injury on October 26, 2015, where she saw Dr. Greg Kazemi. Dr. Kazemi testified Wyrick told him she had fallen and injured her nose on the morning of October 25. Wyrick had a laceration over her nose and bruising in both eyes. Dr. Kazemi testified he did not order an x-ray to determine whether Wyrick's nose was broken because the management of Wyrick's injuries would be the same regardless whether her nose was broken or not. Dr. Kazemi diagnosed her with a nasal laceration and mild concussion. He explained a broken nose can cause two black eyes.

¶11 Dr. Kevin Eichhorn testified he saw Gomez in the emergency room on October 25, 2015—the date Wyrick reported to Dr. Kazemi as the day she had sustained her head injuries. Gomez came into the emergency room with a hand injury. He told Dr. Eichhorn he was working on his car the night before at 2 a.m. and the hood fell and slammed onto his hand. Dr. Eichhorn diagnosed Gomez with a "boxer's fracture." Dr. Eichhorn explained it is called a boxer's fracture because the most common mechanism for the injury

is from punching something, but the injury could be consistent with a car hood slamming on the hand.

¶12    Wyrick followed up with her family medicine physician, Dr. Katherine Krebsbach, on October 30, 2015, with residual symptoms from her head injury. Wyrick told Dr. Krebsbach she had hit her face on a staircase about a week prior and had gone into the emergency room on October 26, 2015. Dr. Krebsbach explained Wyrick had scabbing over the front of her nose, some bruising on her face, and was physically tired. Dr. Krebsbach diagnosed Wyrick with post-concussive syndrome and provided her with a note to excuse her from work. Dr. Krebsbach also saw Gomez on November 24, 2015, when he came in for follow-up on his broken hand. Gomez told Dr. Krebsbach he had smashed it in the hood of his car a month earlier. At the time, she did not know Gomez and Wyrick were in a relationship and his explanation seemed consistent with his injury. Dr. Krebsbach testified, however, looking back on the two injuries now gave her significant pause. She explained that boxer's fracture most commonly occurs when someone punches something hard and Gomez's injuries presented around the same time Wyrick injured her nose.

¶13    Fairclough testified she brought Wyrick to the emergency room on December 16, 2015. Wyrick showed up for her shift that day, but it soon became clear she was in too much pain to work. Multiple coworkers testified they witnessed Wyrick curled up in pain, moving slowly, and holding her ribs. At the emergency room, Wyrick first saw the triage nurse, Bennet Holz. Wyrick told Holz her boyfriend had beaten her about an hour before. Wyrick was in physical pain. She told Holz she wanted to make sure it was not life

7

threatening. Wyrick told Holz her boyfriend had struck, choked, and punched her and kicked her in the ribs. Holz observed a mark on Wyrick's neck like a strangulation or ligature mark. Holz testified it was normal procedure to take a history of previous violence in domestic violence cases so medical personnel can consider previous injuries and potential further injury in deciding treatment and to aid providers in developing a plan and recommendations for the patient. Holz encouraged Wyrick to let her call law enforcement, but Wyrick declined, telling Holz she had a plan to get out of the relationship. Dr. Jessica Suess was Wyrick's treating physician in the emergency room that day. An x-ray showed Wyrick to have a previous rib fracture that was healing, but no new rib fracture or refracture. Radiologist Dr. Richard Dahlen, who read the x-ray, testified that given the callous formation, the old fracture was at least four to six weeks old. Dr. Suess diagnosed Wyrick with rib pain and a chest wall contusion. Dr. Seuss explained a rib injury could still be painful even without a new fracture and would cause difficulty in breathing, walking, and working. Wyrick declined to let Dr. Seuss call law enforcement. Dr. Seuss called a social worker to talk to Wyrick.

¶14 Radcliff and Straight picked Wyrick up from the emergency room on December 16 and brought her back to their house. Wyrick lay on the bed at their house crying for several hours. Later that evening or the next morning, Gomez came to their house and picked Wyrick up and brought her back to his house.

¶15　Fairclough and Weare testified Wyrick returned to work the next day. Weare testified Wyrick last came to work on December 19, 2015, but failed to show up for her next scheduled shift on December 21.

¶16　Radcliff and Straight testified Wyrick stayed the night at their house on December 20, and while there, Gomez came over and Wyrick and Gomez argued outside. Straight testified Gomez was trying to get Wyrick to come back with him. Straight intervened telling Gomez, "I don't know what's going on but seems to me like she doesn't want to be with you anymore." Gomez left. Radcliff and Straight testified Wyrick was depressed and wanted out of the relationship with Gomez. Wyrick was sleeping on the floor of their living room when they went to bed but was not there when they woke up the next morning. She left behind her phone and gloves. A roommate's daughter, who was staying with Radcliff and Straight, testified Gomez arrived at the house early in the morning on December 21 and Wyrick left with him. This was the last time any of them saw Wyrick.

¶17　Four of Gomez's five roommates testified at the trial. All four testified Gomez kept to himself and they would see Wyrick in passing, but never really talked to her. Gomez's roommates each testified they would regularly hear Gomez and Wyrick fighting in Gomez's room. One roommate, Christopher Eckhoff, testified he would see Gomez and Wyrick almost daily in passing. They would make food and go to their room. Eckhoff explained that his room was directly below Gomez's room. Eckhoff noticed an increase in arguing and yelling from when he moved into the house in June or July 2015 until

9

December. He could not tell what Gomez and Wyrick argued about, because the arguments always took place in Gomez's room with the door closed. He would hear a lot of swearing from Gomez and would sometimes hear things being thrown or loud noises like thumps. Eckhoff had discussions with his other roommates about how the arguing was making them uncomfortable because it was "getting so loud" and "out of proportion." Eckhoff testified he could hear a lot of anger and energy behind Gomez's yelling, but did not hear the same anger and energy in Wyrick's responses.

¶18 Eckhoff testified he and his then-girlfriend, Hannah Kendall, woke to the sound of arguing coming from Gomez's bedroom on December 21, 2015, sometime around 9 a.m. Eckhoff recognized the voices as Gomez and Wyrick. The fight escalated until Eckhoff heard a loud scream and a crash or thump. Eckhoff testified: "Something was definitely wrong. I had never heard anything like that before." Kendall testified, "It was a scream unlike I had ever heard." Eckhoff testified he got up and started getting dressed because he was frustrated about hearing fighting between Gomez and Wyrick and wanted to confront Gomez. He did not go upstairs immediately, however, because Kendall was worried about Eckhoff's safety and insisted he wait for her before going upstairs. Eckhoff testified that after Kendall got dressed, he went upstairs and knocked on Gomez's bedroom, but no one answered, and the door was locked. Kendall called him to the front door, and he got there in time to see Gomez speeding out of the driveway in his black GMC Yukon. Kendall testified she saw Gomez run out of the house when she and Eckhoff were coming up the stairs. She went to the front door and saw him in his Yukon, reaching at something

in the backseat before speeding off. Kendall and Eckhoff went outside and both testified they saw fresh blood on the front steps—which later tested positive for Wyrick's DNA—and blood in the snow where the Yukon had been parked. Kendall testified that upon going back inside she saw a trail of blood from Gomez's room door to the front door, "like if someone's having a nosebleed and they're running and . . . it's just continuously on the ground." Eckhoff contacted another roommate and said he wanted to call the police. That roommate told him not to call because it would cause more problems than it would solve. Eckhoff and Kendall did not call the police. Eckhoff and Kendall wrote and left a note on Gomez's bedroom door: "Not sure what is going on, but I would like an explanation of what happened. Almost called the police. There's blood everywhere. This is not the first time I've woke to screaming and sounds of hitting and shoving. Please take a break." Eckhoff said he texted Gomez a similar message. Later that day, Gomez texted back "Okay, I will." Eckhoff got no further explanation from Gomez about what happened.

¶19 After writing the note, Kendall and Eckhoff went to Pattee Creek Market to purchase ingredients for breakfast and see if Wyrick was working. They did not see Wyrick. Store records showed they checked out at the market at 10:41 a.m. When they returned home, the note had been removed from Gomez's door and there was no blood in the hallway. They did not see Gomez or Wyrick. Jeffrey Neubauer, another roommate, testified he was also awoken by the argument between Gomez and Wyrick on December 21, but went back to sleep. He testified the argument seemed more aggravated than Gomez and Wyrick's usual arguing, because they usually did not wake him. He later

11

heard a door slam. When he got up later, he talked to Eckhoff and Kendall about what they heard. No other roommates were in the house that morning.

¶20 Dillon Moore, one of Wyrick's deli coworkers, testified he grew worried when Wyrick failed to show up for work several days in a row. As such, on December 24, 2015, he and his mother, Sherrie Harguess, went to Gomez's house to look for Wyrick. Harguess and Moore testified Gomez was loading something into his Yukon in the garage when they arrived, and his Avalon was running in the yard with its doors open. Harguess testified she told Moore to stay in the car and she got out to confront Gomez, leaving the door of her car open. Moore testified he could hear what Gomez said through the open door. Both testified Harguess asked Gomez where Wyrick was and Gomez responded that Wyrick left "[a]nd she ain't comin' back." Harguess left and called 9-1-1 to report Wyrick as missing.

¶21 That day, the Missoula Police Department opened an investigation, assigning Detective Stacy Lear as lead detective. Officers attempted to conduct a welfare check on Wyrick at Gomez's residence but could not locate her. Officers then reached out to Wyrick's family members and the emergency department staff who saw Wyrick on December 19. Based on the information from the emergency room, Gomez was detained and taken to the police station. At the station, Lear found screws in Gomez's pocket that matched the center console from his Yukon and a stain on his shoe that later tested positive for Wyrick's blood and DNA.

¶22 Officers obtained and executed a search warrant on Gomez's residence. From their search of the residence, officers recovered the top of the center console of Gomez's Yukon

12

in his bedroom along with the note Eckhoff and Kendall had left on Gomez's door. Officers also found a pile of rags and other cleaning supplies in Gomez's bathroom. One of the rags tested positive for Wyrick's blood and DNA. In Gomez's Avalon, officers recovered a receipt for the cleaning supplies, showing their purchase on December 22, as well as a pile of blankets that appeared to have been freshly laundered. Officers later recovered footage from Walmart of Gomez purchasing the cleaning supplies. From the Yukon, officers recovered Wyrick's wallet; additional cleaning supplies; a black duffle bag; Marlboro cigarettes; a screwdriver; a letter postmarked November 4, 2015, with a stain on the corner; and a flashlight with a stain on the handle. Officers observed stains on the side of the center console and on the outside of the vehicle between the front and back door of the passenger side of the vehicle. Part of the carpeting between the rear and front seats had been cut out of the Yukon. The stains on the letter, flashlight, console, and outside of the vehicle all tested positive for Wyrick's blood and DNA.

¶23 Detective Katie Petersen testified she began working the case on December 24. As part of the search for Wyrick on December 24, Petersen put in an emergency request to AT&T to get all location data from Gomez's phone going back to the morning of December 21. She received an eight-page report with GPS coordinates. The coordinates from 10:01 a.m. MST on December 21 placed the phone in Pattee Canyon near Deer Creek. The report stated that accuracy was "likely better than 5,000 meters." On the evening of December 24, Detective Petersen met with Bill Burt from the Missoula County Sheriff's office and a couple of Forest Service officers in the Pattee Canyon recreation area.

13

Together they snowmobiled to the coordinates from the report, which brought them to a cell phone tower. They looked around the area but did not find Wyrick and called off the search because it was too dark to continue searching.

¶24 Burt and Petersen coordinated another search on December 27. Burt testified, in his experience with the Missoula County Search and Rescue, coordinates from cell phone providers often lead to that cell phone tower when the phones were actually located in an area east and south of the tower. Based on this observation, the December 27 search focused on that area, where Wyrick's body was then recovered. The body was located below a disturbance in a snow berm on the side of the road down a steep ravine. Officers recovered packaging from Marlboro cigarettes and observed what looked like blood at the side of the road above where Wyrick's body was found. The body was not visible from the road. Lear testified the body's location was about an 11-minute drive from Gomez's residence.

¶25 In their searches, officers also collected and downloaded data from four cell phones. Two were found in Gomez's Yukon, one was taken from his person, and the fourth was the cell phone Wyrick left at her brother's house on the morning of December 21. The data from the phones showed extensive texting between Wyrick and Gomez during their relationship. On December 16, Gomez sent Wyrick messages begging her to come back—"Charlie I know I've hurt you really bad but please." On the night of December 20, Wyrick and Gomez texted extensively, with Gomez alternating between apologizing to Wyrick, telling her he loved her, and accusing Wyrick of leaving him. There was no more

activity from Wyrick's phone after that night. Gomez texted Wyrick once at 1:29 p.m. on December 21 and once more on December 23. In the days between December 21 and his arrest on December 24, Gomez's phone had internet searches for Missoula stabbings, police scanner codes, and missing persons. Wyrick was not reported missing until December 24.

¶26 Dr. Nikki Mourtzinos conducted Wyrick's autopsy. Dr. Mourtzinos found a single stab wound to the chest injuring the lung and left main bronchus. Dr. Mourtzinos found a significant amount of blood—about 600 milliliters—in the left chest cavity. She explained it would have taken some time for this amount of blood to accumulate. She also saw signs of aspirating blood into smaller airways. From these findings, Dr. Mourtzinos opined Wyrick had been alive for some period of time post injury. While Dr. Mourtzinos could not determine how long Wyrick survived after being stabbed, she had seen footage of a person with a lung injury survive four hours without medical treatment. Dr. Mourtzinos testified she did not know if Wyrick could have survived the stab wound had she received medical attention, but it was possible. In addition to the stab would, Dr. Mourtzinos also found blunt force injuries to the torso along with 100 milliliters of blood in the abdominal cavity, recent reinjury of a healing spleen injury, and a new rib fracture in the area of an old rib fracture. She noted again that for 100 milliliters of blood to accumulate in the abdominal cavity, Wyrick had to have survived for some period of time post injury. Dr. Mourtzinos noted that while the stab wound was the main cause of death and would be fatal on its own, the blunt force trauma injuries to the torso were a contributing cause of

15

death, because the injuries would have contributed to bleeding and breathing difficulty. Dr. Mourtzinos further noted bruising across Wyrick's torso, back, face, head, legs, and arms all occurring before her death. She did not observe any defensive wounds. Dr. Mourtzinos was not able to determine a day or time of death.

¶27 During trial, the District Court admitted additional out-of-court statements Wyrick made to various friends, family, and coworkers, describing her relationship with Gomez that Gomez challenges on appeal. This testimony is discussed in Issue 3 below.

¶28 Gomez repeatedly re-raised his prior motion to use evidence of Wyrick's drug use during trial, arguing the State opened the door by entering evidence of Wyrick's change in behavior and physical appearance, such as Wyrick's hair loss and bruises on her arms. The District Court continued to exclude the evidence but allowed Gomez to file a proffer of the testimony he expected witnesses would give about Wyrick's drug use.

¶29 After the eight-day trial, the jury found Gomez guilty of both charges. On the homicide conviction, the District Court sentenced Gomez to life in prison without the possibility of parole. On the PFMA conviction, the court sentenced Gomez to one year of time served to run consecutive with his sentence for homicide. Gomez appeals.

**DISCUSSION**

¶30 *1. Whether the District Court properly denied Gomez's motion to sever the counts.*

**Standard of Review**

¶31 We review de novo whether counts were properly joined in an information. *State v. Kirk*, 2011 MT 314, ¶ 10, 363 Mont. 102, 266 P.3d 1262. The defendant has the burden

to prove that counts were misjoined. *State v. Freshment*, 2002 MT 61, ¶ 22, 309 Mont. 154, 43 P.3d 968.

¶32    We review the denial of a motion to sever counts into separate trials based on unfair prejudice for an abuse of discretion. *Kirk*, ¶ 10. A defendant seeking to sever counts into separate trials has the burden of proving severing the counts is necessary to prevent unfair prejudice. *Freshment*, ¶ 26. The trial court must balance possible prejudice to a defendant against the judicial economy resulting from holding a joint trial. *Kirk*, ¶ 11. Abuse of discretion occurs when the trial court fails to properly weigh the prejudice against the judicial economy resulting from a joint trial. *Freshment*, ¶ 27.

**Analysis**

¶33    Gomez challenges the District Court's denial of his motion to sever the two counts. Gomez maintains the counts were inappropriately joined because the acts of domestic violence relevant to the PFMA charge were not contemporaneous in time and place with the act of deliberate homicide and a person who commits acts of domestic violence does not necessarily have a scheme or plan to kill the victim. Gomez further argues that, even if properly joined, severing the counts was necessary to prevent unfair prejudice. He argues joinder of the counts prejudiced him because evidence of Gomez's prior abuse of Wyrick would not have been admissible in a separate trial for homicide and he would likely have testified on his own behalf in a separate trial on the homicide charge.

¶34    To succeed on a motion to sever counts, a criminal defendant must prove either the counts were misjoined under § 46-11-404(1), MCA, or severing the counts under

17

§ 46-13-211(1), MCA, is necessary to prevent unfair prejudice against the defendant. *Kirk*, ¶ 10. Section 46-11-404(1), MCA, allows joinder of offenses when they "are of the same or similar character or are based on the same transactions connected together or constituting parts of a common scheme or plan." Joining two charges is proper when "the charges are logically linked by motive and where overlapping proof must be offered." *State v. Southern*, 1999 MT 94, ¶ 23, 294 Mont. 225, 980 P.2d 3. Section 46-13-211(1), MCA, requires severance of properly joined counts, however, if the defendant proves the prejudice caused by the joinder of the counts is so great as to prevent a fair trial. *Kirk*, ¶ 10. It is not enough to show the defendant faces some prejudice or that the defendant would stand a better chance of acquittal if separate trials are held. *Kirk*, ¶ 10. The court must consider three types of possible unfair prejudice: (1) whether the accumulation of evidence may lead a jury to find the defendant is a bad person and wish to convict the defendant of something; (2) whether a jury might use evidence of guilt on one count to convict on another count, even though the evidence would be inadmissible at a separate trial on the latter count; and (3) whether the defendant may suffer prejudice by wanting to testify on one count and not another. *Freshment*, ¶ 27.

¶35    We disagree with Gomez that the two counts were not properly joined under § 46-11-404(1), MCA. The PFMA and homicide counts arose out of an ongoing pattern of physical abuse perpetrated against Wyrick by Gomez. Gomez's acts of violence against Wyrick, including his acts leading to her ultimate death, "are explainable as a result of the same motive." *State v. Dist. Court of Eighteenth Judicial Dist.*, 2010 MT 263, ¶ 59,

18

358 Mont. 325, 246 P.3d 415. Gomez's physical abuse of Wyrick and her death during their final altercation are logically linked by the same motive—to control Wyrick. Given this ongoing pattern and motive, proof of the PFMA and homicide counts requires testimony from substantially the same witnesses. The charges were properly joined as parts of a common scheme or plan. *See Southern*, ¶ 23.

¶36 Further, Gomez has failed to prove he was deprived of a fair trial due to the joinder of the two counts. First, Gomez failed to demonstrate that evidence of prior acts of PFMA against Wyrick would be inadmissible in a separate trial for homicide.[1] Gomez cannot demonstrate evidence of Gomez's prior abuse of Wyrick would have been categorically excluded from a separate trial for homicide. For example, there are valid theories of admissibility for such evidence under M. R. Evid. 404(b). *See, e.g., Dist. Court of the Eighteenth Judicial Dist.*, ¶¶ 58-61. In *District Court of the Eighteenth Judicial District*, the defendant sought to categorically exclude evidence of her prior abuse of the victim in a homicide trial, claiming such to be inadmissible prior bad acts evidence excluded by Rule 404(b). *Dist. Court of Eighteenth Judicial Dist.*, ¶ 57. That defendant contended the State could not use other acts evidence to show lack of accident because she was not raising a defense of accident. *Dist. Court of Eighteenth Judicial Dist.*, ¶ 61. We held, however,

---

[1] Gomez broadly argues the evidence of Gomez's prior abuse would not be admissible in a separate homicide trial. He specifically cites the admission of out-of-court statements from Wyrick of threats Gomez made to her about future acts in the area where her body was eventually found as particularly prejudicial. We address here Gomez's general assertions that evidence of his prior abuse of Wyrick would not be admissible and discuss Gomez's more specific challenge to the admission of out-of-court statements from Wyrick in Issue 3.

that the defendant had suggested to authorities the death was accidental and concluded the State could introduce evidence of prior victim mistreatment "in order to rebut this implication." *Dist. Court of Eighteenth Judicial Dist.*, ¶ 61. We further explained the prior abuse may also be admissible as "*evidence*[ *of*] *the existence* of a motive" under Rule 404(b):

> the motive is cause, and the charged and uncharged acts are effects; that is, both acts are explainable as a result of the same motive. The prosecutor uses the uncharged act to show the existence of the motive, and the motive in turn strengthens the inference of the defendant's identity as the perpetrator of the charged act.

*Dist. Court of the Eighteenth Judicial Dist.*, ¶ 59 (footnote omitted). Given this precedent, Gomez has not established evidence of his prior abuse of Wyrick would categorically be inadmissible in a separate homicide trial and thus failed to carry his burden of proving he was prejudiced by the joinder of the charges. At trial, the State alleged Gomez had a motive to control Wyrick, leading to an ongoing pattern of physical abuse, which culminated in Wyrick's death. Under this theory, evidence of Gomez's prior abuse of Wyrick would not categorically be precluded from admission under Rule 404(b).

¶37 Finally, Gomez failed to prove his right against self-incrimination was compromised because he wanted to testify to one charge and not the other. The defendant has the burden of proving joinder of the charges confounded his defense by compromising his privilege against self-incrimination. In his pretrial motion to sever, Gomez did not assert he wanted to testify on his own behalf as to the homicide count, but not the PFMA count. Before this Court, Gomez provides only self-serving statements he would have testified in a separate

20

trial for the homicide charge. This assertion is not sufficient to show prejudice. *State v. Martin*, 279 Mont. 185, 197, 926 P.2d 1380, 1388 (1996).

¶38 The District Court did not abuse its discretion in denying Gomez's motion to sever the counts.

¶39 *2. Whether the District Court abused its discretion when it excluded evidence of the victim's drug use and denied Gomez's motion for a new trial.*

**Standard of Review**

¶40 We review a district court's evidentiary rulings for an abuse of discretion. *State v. Hardman*, 2012 MT 70, ¶ 8, 346 Mont. 361, 276 P.3d 839. A district court's denial of a motion for a new trial is reviewed for an abuse of discretion. *State v. Brummer*, 1998 MT 11, ¶ 49, 287 Mont. 168, 953 P.2d 250.

**Analysis**

¶41 Gomez argues the District Court abused its discretion when it excluded evidence of Wyrick's drug use. Gomez contends Wyrick's drug use was relevant as an alternate explanation for her behaviors and accounts for some of her injuries and was admissible under M. R. Evid. 403 and 404. Gomez maintains that regardless whether the evidentiary rules barred evidence of Wyrick's drug use as a matter of law, the District Court erred in denying his motion for a new trial because its ruling to exclude evidence of Wyrick's drug use on the eve of trial severely hampered his ability to rebut and refute the charges against him.

¶42 Evidence of a person's character trait "is not admissible for the purpose of proving action in conformity therewith on a particular occasion," excepting

21

> [e]vidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case or in an assault case where the victim is incapable of testifying to rebut evidence that the victim was the first aggressor.

M. R. Evid. 404(a). Evidence that is admissible under Rule 404, however, may still be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

¶43     While Gomez contends Wyrick's drug use was a pertinent character trait to explain her behaviors and her injuries, he has not explained how Wyrick's use of methamphetamine provides an alternate explanation of her injuries. Gomez proffered no evidence connecting Wyrick's drug use to her change in behavior and injuries: None of the proffered testimony stated Wyrick acted differently while using methamphetamine or was more prone to being injured by stabbing while using methamphetamine. Further, Gomez does not explain how the victim's drug use rebuts the State's case that Gomez intentionally and deliberately injured the victim on multiple occasions and stabbed her, causing her death. Thus, we can only conclude Gomez relies on speculation, not inference, to connect Wyrick's drug use to her injuries and death. We conclude Wyrick's drug use was not a pertinent character trait.

¶44     None of the federal cases cited by Gomez support his position. The three homicide cases Gomez cites involved admitting evidence that demonstrated the defendant's knowledge of the victim's prior violent acts. *See United States v. Garcia*, 729 F.3d 1171,

1178-79 (9th Cir. 2013); *United States v. Saenz*, 179 F.3d 686, 688-89 (9th Cir. 1999); *United States v. James*, 169 F.3d 1210, 1214-15 (9th Cir. 1999). Gomez proffered no testimony that Wyrick was violent, whether she was on methamphetamine or not. The other two federal cases Gomez cites are not criminal cases, but civil suits, alleging excessive force by police officers. In those two cases, the courts admitted evidence that the deceased were on drugs at the time of their deadly encounters with police to explain the victims' behavior at the time of the incidents in question. *See Boyd v. City & Cty. of San Francisco*, 576 F.3d 938, 949 (9th Cir. 2009); *Alegrett v. City & Cty. of San Francisco*, No. 12-cv-05538-MEJ, 2014 U.S. Dist. LEXIS 65205, at *3 (N.D. Cal. May 9, 2014). In contrast, Gomez sought to introduce evidence of Wyrick's general drug use "to offer another explanation for the State's allegations against Gomez." Gomez claims Wyrick's drug use provides an alternate explanation for her behaviors and injuries, but again proffered no evidence connecting Wyrick's drug use to her change in behavior and injuries. Gomez also asks us to adopt a broader "context exception" to Rule 404(b), citing two out-of-state cases. On this record, we decline to do so.

¶45 Wyrick's drug use provided little probative value to explain her behavior and minor bruising and no probative value to explain her most serious injuries that resulted in multiple visits to the emergency room and her ultimate death by stabbing. The unfair prejudice of painting Wyrick as a drug user to inflame the jury against her, however, was high. The District Court did not abuse its discretion in concluding evidence of Wyrick's methamphetamine use was barred by M. R. Evid. 403 and 404, because it was not a

23

pertinent character trait and its probative value was substantially outweighed by the danger of unfair prejudice. Evidence of Wyrick's drug use is not admissible to invite the jury to speculate about other causes for her injuries, without providing any evidence—direct or circumstantial—to support those speculations.

¶46 Finally, we reject Gomez's argument the District Court abused its discretion in denying his motion for a new trial. A district court may order "a new trial if required in the interest of justice." Section 46-16-702, MCA. The District Court's ruling, which properly excluded inadmissible character evidence, was not unfair to Gomez. Thus, the District Court did not abuse its discretion in denying Gomez's motion for a new trial.

¶47 *3. Whether the District Court abused its discretion admitting numerous out-of-court statements from the deceased victim.*

**Standard of Review**

¶48 We review the district court's evidentiary rulings for an abuse of discretion. *State v. Colburn*, 2018 MT 141, ¶ 7, 391 Mont. 449, 419 P.3d 1196. A court abuses its discretion if it acts arbitrarily without conscientious judgment or exceeds the bounds of reason. *Colburn*, ¶ 7.

**Analysis**

¶49 Gomez challenges the admission of various out-of-court statements attributed to Wyrick at trial. Gomez challenges all the statements admitted at trial over objection as cumulative error generally, but specifically challenges the District Court's admission of statements purporting to convey Wyrick's state of mind under M. R. Evid. 803(3) and *State*

24

*v. Lossen*, 262 Mont. 342, 865 P.2d 255 (1993).[2] Gomez argues that evidence of Wyrick's state of mind was not relevant because he did not raise a self-defense or accident defense at trial. He maintains Wyrick's fear was not relevant because any actions constituting retaliation or initial violence toward him are not an issue in the case, and the prejudicial dangers of the out-of-court statements was great.

¶50 The State sought to admit over one hundred out-of-court statements Wyrick made to friends, family, co-workers, and medical personnel.[3] The court refused to admit many of the statements but admitted a substantial number of Wyrick's statements as nonhearsay or as an exception to the hearsay rule. As Gomez points out, many of these statements were admitted as evidence of Wyrick's state of mind, either under Rule 803(3) or *State v. Lossen*. Gomez specifically cites testimony from eight witnesses in his brief. The specified statements generally fall into one of several categories: statements that Wyrick was afraid of Gomez; statements about her plan to leave Gomez and move back to Helena; statements describing her injuries and Gomez's abuse; statements that Gomez threatened to kill her if

---

[2] In his reply brief, Gomez asserts his challenge is not limited to out-of-court statements regarding state of mind, but he challenges all out-of-court statements admitted at trial over objection, both individually and cumulatively. He provides no legal argument or citation, however, to support his contention the District Court abused its discretion in admitting hearsay statements under any other theory. We decline to develop legal arguments for him. *See Johnston v. Palmer*, 2007 MT 99, ¶ 30, 337 Mont. 101, 158 P.3d 998 ("[I]t is not this Court's obligation to conduct legal research on behalf of a party, to guess at his or her precise position, or to develop legal analysis that may lend support to that position."). Thus, we limit our analysis to Gomez's challenge to out-of-court statements admitted as evidence of Wyrick's state of mind.

[3] Gomez does not challenge the admission of Wyrick's out-of-court statements to medical personnel on appeal.

she ever left him; statements that Gomez threatened to kill her and dispose of her body in Pattee Canyon; and statements that male colleagues should not talk to her because Gomez was jealous.[4]

¶51    This Court explained in *State v. Lossen* that out-of-court statements may demonstrate the declarant's state of mind either directly or indirectly. *Lossen*, 262 Mont. at 348, 865 P.2d at 259. A statement that indirectly reveals the declarant's state of mind not entered for the truth of the matter asserted, is not hearsay, is not subject to the rule against hearsay, and may be admissible when the declarant's mental state is a material issue in the case. For example, a statement that circumstantially indicates a specific state of mind, such as "X is no good" may be admissible to demonstrate the speaker's dislike of X rather than to prove a quality of X. A jury's consideration of such a statement, however, is limited to its probative value in determining the speaker's state of mind and not as direct proof of the assertion made in the statement. *See Lossen*, 262 Mont. at 348-49, 865 P.2d at 259; *see also* 6 John Henry Wigmore, *Evidence in Trials at Common Law* § 1790, 320 (Chadbourn rev. 1976) ("The assertion, if in form there is one [in a statement admitted as circumstantial evidence of the declarant's state of mind], is to be disregarded, and the indirect inference alone regarded. This discrimination, though well accepted in law, is easy to be ignored, and it needs to be emphasized.").

---

[4] The State points out that some of the specific statements Gomez cites were not admitted as state of mind evidence, but as an excited utterance under Rule 803(2) or a present sense impression under Rule 803(1). We limit our analysis to statements admitted as evidence of Wyrick's state of mind.

¶52     When a statement directly reveals the declarant's state of mind—such as the statement "I hate X" to show the speaker's dislike of X—that statement is entered for the truth of the matter asserted and is hearsay. For these statements, Rule 803(3) provides an exception to the general prohibition against hearsay and allows a court to admit "[a] statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed." The Commission Comments to M. R. Evid. 803(3) explain this exception "allows hearsay statements to prove state of mind from which future actions of the declarant may be inferred" but "the state of mind exception is not allowed to be used to infer past actions of the declarant." Committee Comments to M. R. Evid. 803 (citing Advisory Committee's Note to Fed. R. Evid. 803, 56 F.R.D. 183, 305 (1972)). "[T]o avoid the virtual destruction of the hearsay rule," Rule 803(3) specifically excludes "statements of memory to prove the fact remembered or believed" so that statements admitted under Rule 803(3) do not "serve as the basis for an inference of the happening of the event which produced the state of mind." Commission Comments to M. R. Evid. 803 (quoting Advisory Committee's Notes to Fed. R. Evid. 803, 56 F.R.D. 183, 305 (1972)). In other words, to prevent the exception from swallowing the rule, Rule 803(3) permits courts to admit out-of-court statements that

directly reveal the declarant's state of mind, but excludes the parts of those statements that explain the external circumstances that caused that state of mind.[5]

¶53     Thus, whether admitted as indirect or direct evidence of the declarant's state of mind, the statements are admitted for a limited purpose.  Out-of-court statements revealing a victim's fear of the defendant when the victim is unavailable to testify raise special concerns, due to the potential prejudice that jurors will use the evidence to make impermissible inferences beyond the limited scope for which the evidence was admitted.[6] Whether admitted as nonhearsay or as an exception to the hearsay rule under Rule 803(3), "[t]he threshold requirement of admissibility of such [out-of-court] statements of fear of defendant in homicide cases is some substantial degree of *relevance* to a material issue in

---

[5] This makes sense because exceptions to the hearsay rule are justified by necessity and circumstantial guarantees of trustworthiness.  But

> [s]tatements of the *external circumstances causing the injury*, namely, the events leading up to it, the immediate occasion of it . . ., or the nature of the injury . . ., do not satisfy the necessity principle, because they do not relate to an internal state, and thus other evidence is presumably available; moreover they have not the usual condition of trustworthiness, because they are not naturally called forth by present pain or suffering.

6 John Henry Wigmore, *Evidence in Trials at Common Law* § 1722, 118 (Chadbourn rev. 1976).

[6] For this reason, we have explained that all evidence admitted to show the declarant's state of mind, whether as nonhearsay or under the hearsay exception of Rule 803(3), must be accompanied with a limiting instruction from the court, explaining the limited use of testimony to show the declarant's state of mind. *See State v. Fuhrmann*, 278 Mont. 396, 407, 925 P.3d 1162, 1169 (1996) ("To prevent any potential prejudicial effect on a defendant, and to uphold the integrity of both the hearsay rule and Rule 803(3)'s 'state of mind' exception, a trial court must instruct the jury as to the limited purpose for which it may consider this type of testimony.  However, both the trial court and this Court must keep a vigilant eye toward the possible prejudicial effect of such testimony even if a limiting instruction is given."), *overruled on other grounds by State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735.  Although unchallenged on appeal, it is clear from the record the District Court failed to give appropriate limiting instructions to the jury about Wyrick's out-of-court statements admitted to prove her state of mind.

the case." *State v. Magruder*, 234 Mont. 492, 496, 765 P.2d 716, 719 (1988) (quoting *United States v. Brown*, 490 F.2d 758, 767 (D.C. Cir. 1973)). The relevance of the evidence must be considered against the danger the jury will misuse the testimony.

¶54    Gomez's argument focuses on whether Wyrick's state of mind was relevant to a material issue in the case because, unlike the defendant in *Lossen,* he did not argue he acted in self-defense or that Wyrick's death was an accident. The State maintains Wyrick's state of mind was relevant, nonetheless. The State's theory of the case was that Gomez's motive was to control Wyrick through fear and violence and this ultimately led to her death. Under this theory, Wyrick's fear is relevant as evidence of Gomez's motive to control her.

¶55    After reviewing the record in this case, we conclude the District Court abused its discretion in admitting Wyrick's out-of-court statements to prove she feared Gomez, because the danger of jury misuse of the evidence far outweighed any relevance of the evidence to a material issue in the case.[7] The State's proposed path of relevance is a circuitous route: Wyrick's fear was proof of Gomez's motive to control her, and his motive to control her made it more likely that he in fact committed PFMA against her and killed her. Even the prosecution did not bother to follow this chain of logic, repeatedly using Wyrick's statements as direct proof of Gomez's abuse in its closing argument. The State's theory of relevance for Wyrick's state of mind "bears only a remote or artificial relationship to the legal or factual issues raised in the case" and the evidence is thus inadmissible.

---

[7] Out-of-court statements from Wyrick that she was in physical pain or that she had a plan to leave Gomez were admissible under Rule 803(3) and do not raise the same concerns as her statements entered to show her fear of Gomez.

*Brown*, 490 F.2d at 774. The District Court abused its discretion in admitting Wyrick's out-of-court statements as evidence of her state of mind.

¶56 The District Court's error, however, does not require automatic reversal. We will not reverse the District Court if the error was harmless.

> In order to prove that trial error was harmless, the State must demonstrate that there is no reasonable possibility that the inadmissible evidence might have contributed to the conviction. To do this, the State must demonstrate that the fact-finder was presented with admissible evidence that proved the same facts as the tainted evidence and, qualitatively, by comparison, the tainted evidence would not have contributed to the conviction.

*State v. Van Kirk*, 2001 MT 184, ¶ 47, 306 Mont. 215, 32 P.3d 735.

¶57 Here, we conclude admission of Wyrick's out-of-court statements was harmless in light of the overwhelming substantial evidence presented in addition to these statements. Here, there is no reasonable possibility the evidence at issue might have contributed to Gomez's conviction of either PFMA or homicide, because all the evidence admitted through Wyrick's out-of-court statements was cumulative. The State elicited testimony from multiple witnesses that when Gomez was around, Wyrick's demeanor would change and she would not talk to male colleagues, demonstrating her fear of him. The State presented testimony from medical personnel, detailing injuries Wyrick received in October and shortly before her death. Gomez's roommates testified to regularly hearing fighting between Gomez and Wyrick in Gomez's room and would hear things being thrown and loud thumps. Three witnesses heard Gomez and Wyrick fighting on the last morning she was seen. Two of those witnesses described hearing a loud scream unlike any they had heard before and a loud thump, before silence fell. Those witnesses observed Gomez

30

running out to his vehicle and speeding away from the house while holding something down in the backseat. They observed blood in the hallway, the front steps, and next to where Gomez's vehicle had been parked. The blood on the front steps was determined by DNA testing to be Wyrick's. Police found Wyrick's blood in Gomez's vehicle and evidence of an attempted clean up, including pictures of Gomez purchasing cleaning supplies the day after Wyrick's disappearance and bloody rags in his car and shower. Straight testified he told Gomez on December 20 that Gomez should leave because it did not seem like Wyrick wanted to be with him anymore, and Gomez's text messages from that night show he accused Wyrick of leaving him. Wyrick was last heard from the next morning while fighting with Gomez. Records from Gomez's wireless provider placed Gomez's phone in Pattee Canyon on the morning of Gomez and Wyrick's last argument and this location information led law enforcement to her body. Wyrick's autopsy revealed she had been stabbed and her lung was perforated. The jury was presented with admissible evidence that provided the same facts as the evidence admitted to show Wyrick's state of mind. Our review of the admissible evidence makes clear that, qualitatively, there is no reasonable possibility the tainted evidence might have contributed to Gomez's conviction.

¶58    *4. Whether Gomez is entitled to a new trial due to cumulative error.*

¶59    Gomez argues he is entitled to a new trial due to the cumulative effect of errors during his trial. In addition to the three issues discussed above, Gomez argues the District Court erred in admitting out-of-court statements from Wyrick other than to demonstrate her state of mind, excluding his expert's testimony as to his state of mind, denying a mistrial

31

for discovery violations, admitting evidence from cell phone tower records, admitting prejudicial photos of Wyrick, and refusing to instruct the jury on negligent homicide and an alternative definition of reasonable doubt proposed by Gomez. Gomez provides no legal argument or citation for these additional assignments of error.

¶60 We will reverse a conviction under the doctrine of cumulative error when the number of errors, taken together, prejudice a defendant's right to a fair trial. *State v. Flowers*, 2004 MT 37, ¶ 46, 320 Mont. 49, 86 P.3d 3. The defendant bears the burden of proving the existence of prejudice. *Flowers*, ¶ 46. This Court, however, will not "consider allegations of error which are devoid of argument or authority supporting the defendant's contentions." *Flowers*, ¶ 47.

¶61 We will not consider Gomez's assignments of error that lack any legal support. Gomez provided argument and authority for only three of his assignments of error. As discussed above, the court erred in admitting some of Wyrick's out-of-court statements, but such error was harmless. Thus, we find no grounds to apply the doctrine of cumulative error in this case. *See Flowers*, ¶ 47; *Hardman*, ¶ 9.

**CONCLUSION**

¶62 The verdict against Gomez is affirmed.

/S/ INGRID GUSTAFSON

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON

32