FILED

10/06/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0218

DA 19-0218

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 249

STATE OF MONTANA,

Plaintiff and Appellee,

v.

SHANE THOMAS PELLETIER,

Defendant and Appellant.

APPEAL FROM:     District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-32-2017-468
Honorable Gregory G. Pinski, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Lance P. Jasper, Reep, Bell, Laird & Jasper, P.C., Missoula, Montana

For Appellee:

Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Helena, Montana

Kirsten H. Pabst, Missoula County Attorney, Brian C. Lowney, Deputy
County Attorney, Missoula, Montana

Submitted on Briefs:  May 27, 2020

Decided:  October 6, 2020

Filed:

_____
Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 Shane Thomas Pelletier appeals his judgment of conviction in the Fourth Judicial District Court, Missoula County, on the offense of sexual intercourse without consent (SIWC), a felony, in violation of § 45-5-503, MCA. We address the following restated issues:

> *1. Whether the District Court erroneously allowed the State to cross-examine Pelletier regarding an unsubstantiated 2003 SIWC allegation for the purpose of rebutting his self-serving good character testimony?*
>
> *2. Whether the District Court erroneously precluded Pelletier from impeaching the testimony of the State's complaining witness with evidence of marijuana use prior to reporting the alleged offense?*
>
> *3. Whether Pelletier received ineffective assistance of counsel based on defense counsel's failure to challenge his fitness to proceed and assert a mental disease or disorder defense at trial?*

We reverse and remand for a new trial.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2 By Information filed August 23, 2017, the State charged Pelletier with subjecting a 20-year-old female (M.V.) to SIWC in his downtown Missoula apartment on July 6, 2017. Prior to the alleged offense, M.V., her boyfriend, a girlfriend, and a female cousin were drinking "Fireball" whiskey from a bottle at Caras Park in Missoula around 11:00 at night. Extremely intoxicated following several "giant swigs" of whiskey, M.V. walked with her girlfriend down to the bank of the Clark Fork River to put their feet in the water. Fully clothed, M.V. waded out further and later came out soaking wet from head to toe. When the group started back to the tent area of the park, M.V. ran ahead and was not present

2

when the others arrived. After searching for several hours in downtown Missoula, they were unable to locate her.

¶3 At some point around or after midnight, Pelletier was on the sidewalk outside his downtown apartment when he heard somebody vomiting in the city parking garage across the street. He later found M.V. vomiting in the parking garage stairwell and asked if she needed assistance. He recalled that she declined his initial offer of assistance but ultimately accepted a subsequent offer to come over to his apartment for some food and water to help sober up. After walking over to Pelletier's apartment,[1] M.V. showered and, according to his account, drank some water and had something to eat. The accounts of M.V. and Pelletier varied sharply from there, but both agree that sexual intercourse eventually occurred.

¶4 At trial, M.V. testified that she had little or no recollection of what happened after she left the park. She said that her next recollection was waking up confused in a strange apartment with an unknown man on top of her with his penis in her vagina. She testified that she then passed out and had no further recollection until the next morning when she was sitting on a bed in her panties and bra, with a naked man standing in front of her trying to put his penis in her mouth. She testified that she immediately pushed him away and that he became "flustered" and "panicked." She said she then asked who he was, where she was, how she got there, and where her clothes were. She testified that Pelletier told her

---

[1] Parking garage surveillance camera footage captured M.V. walking with Pelletier away from the parking garage across the street.

that he found her in the parking garage covered in vomit and that he walked her to his apartment to help. She said that he then retrieved her clothes and she found her pants to be soaking wet and her sweater covered in vomit.

¶5 M.V. testified that, at that point, she was still confused, scared, without her cell phone, and told Pelletier she needed to leave to go to work. She said that he offered to walk her to the bus station and that she consented because she was afraid to say no. She then walked with him to the nearby station where he wrote his telephone number on her arm and bent in to hug her goodbye. She recalled not wanting him to touch her, but politely reciprocating with one arm. She further explained:

> I was confused at the time, and I didn't know what was going on and so I thought what had happened, like, was my fault, and that I wanted it to happen.

She said she just wanted to go home and got on the bus with the feeling that she was in "a bad dream." Upon arriving at her apartment, M.V. told her roommate that she had just been raped. At 8:33 a.m., she sent a text message to the girlfriend who was with her at Caras Park the night before. The text stated that she was raped, could not recall what happened, and asked the friend what happened.

¶6 Later that day at her apartment, M.V. discussed the events of the night before with her boyfriend and the friend who was with them. At her boyfriend's urging, she accompanied him to the police station around 5:00 p.m. to report the alleged rape. After taking her report, a police officer took M.V. to a third-party sexual assault examiner. At trial, the examiner reported observing tenderness and redness about M.V.'s vulva—

4

conditions often indicative of forced penetration, but not necessarily inconsistent with consensual intercourse. Subsequent DNA analysis of a vaginal swab taken from M.V., and a saliva swab later obtained from Pelletier, confirmed the presence of his semen in her vagina the day after the incident.

¶7 Upon subsequent police inquiry, Pelletier admitted that he had sexual intercourse with M.V. but asserted that it was consensual. He initially asserted that she initiated the sex by kissing him and that he sought and obtained her consent before engaging in intercourse. Later in the interview, however, he inconsistently stated that he awoke in the night with M.V. on top of him engaged in intercourse. At trial he testified that, after having something to eat and drink at his apartment, M.V. was "flirting" with him before laying-down on his bed in her bra and panties and passing out. He said that he covered her with a comforter and got into bed with her and went to sleep. He testified that, after waking in the morning, they briefly spoke which led to kissing and then consensual intercourse. He said he later walked her to the bus station "to be a gentleman" and wrote his number on her arm, but did not hear from her.

¶8 At the pretrial Omnibus Hearing, defense counsel gave the State notice of intent to raise a mental disease or disorder defense asserting that, as a result of a mental disease or disorder, Pelletier did not have the requisite mental state for the charged offense.[2] Prior to trial, defense counsel obtained a confidential mental health evaluation that concluded that Pelletier suffered from a form of schizophrenia at the time of the alleged offense. However,

---

[2] *See* §§ 46-13-110(3)(f), 46-15-323(3), 46-14-102, -214, and -301, MCA.

5

counsel did not ultimately disclose the report to the State, challenge Pelletier's fitness to proceed, or assert a mental disease or disorder defense at trial.

¶9      At trial, Pelletier testified on direct, *inter alia*, that M.V. was fully conscious throughout their sexual encounter and that it was completely consensual.  Upon acknowledging to defense counsel that some of the details he gave to police in his post-arrest interrogation were not entirely accurate or consistent with his trial testimony, Pelletier explained:

> I think -- because of being surrounded at my house unexpectedly by the U.S. Marshals, . . . I know it was because of being slandered and charged with this charge because it's . . . one of the worst things that a man can get charged with.  And I'm just not that kind of guy. I would never do that to a female. So it was kind of . . . disturbing.

On the record outside the presence of the jury, the State subsequently stated its intent to cross-examine Pelletier regarding the fact that a 14-year-old female acquaintance alleged to police in 2003 that the 15-year-old Pelletier subjected her to sexual intercourse without consent.  The SIWC allegedly occurred after the two had engaged in consensual sexual foreplay and Pelletier ignored her command to go no further.  The State asserted that the mere fact of the 2003 allegation was relevant to rebut his testimony on direct that he was not the kind of person who would engage in non-consensual sexual intercourse and "would never do that to a female."  The State reasoned:

> He put his character at issue and said that he was not the kind of person that would engage in this kind of offense.  It is basically the whole defense.  So it's absolutely probative of the issue.

6

¶10 Over Pelletier's relevance and prejudice objections, the District Court ruled his testimony that he was "not that kind of guy" and "would never do that to a female" put his good character at issue, thereby opening the door under M. R. Evid. 404(a)(1) to cross-examination regarding the 2003 allegation for the purpose of rebutting his good character testimony. The Court concluded that a limited question regarding the fact of the occurrence of the prior allegation would not be unfairly prejudicial under M. R. Evid. 403 with an appropriate limiting instruction. The following colloquy then ensued on cross-examination:

[State]: You . . . said [on direct] that you felt "slandered." That you would never do anything like this, and you're not that type of person; is that right?

[Pelletier]: I did say that.

[State]: Your Honor, I think this is the time for the [limiting] instruction perhaps.

[Court]: All right. Ladies and gentlemen, the State will now offer evidence that the Defendant at another time engaged in other acts. This evidence is not admitted to show that the defendant acted in conformity therewith in this case. The only purpose of admitting that evidence is to impeach the Defendant's testimony concerning his good character. You may not use that evidence for any other purpose. The Defendant is not being tried for any other act. He may not be convicted for any other act or offense other than that charged in this case. For the jury to convict the Defendant of any other offense than that charged in this case may result in unjust double punishment of the Defendant. . . .[3]

---

[3] The District Court gave a similar limiting instruction as Instruction 28 in the final jury instruction set.

7

[State]:     Thank you, Your Honor.  So you indicated that you're not that type of person, meaning you're not the type of person that would engage in a sexual offense like this; is that right?

[Pelletier]:  That is right, yes.

[State]:     Isn't it true that, in 2003, you were investigated for sexual intercourse without consent against a peer.  Is that right?

[Pelletier]:  That is right, yes.

[State]:     Okay.

.    .    .

¶11    After a 3-day trial, the jury found Pelletier guilty of SIWC as charged.  At sentencing, defense counsel presented the expert testimony of an examining psychologist (Dr. Laura Kirsch, Ph.D.) that Pelletier suffered from a form of schizophrenia, a mental disease or disorder as defined by § 46-14-101(2), MCA.  Defense counsel presented the evidence of the mental disease or disorder as a mitigating sentencing consideration pursuant to §§ 46-14-101(1)(b), -311, and -312, MCA.  The District Court ultimately sentenced Pelletier to serve 40 years in the Montana State Prison, with 20 suspended, and designated him a tier two sex offender under §§ 46-18-111(1)(b), -207, 46-23-504, and -509, MCA (Montana Sexual and Violent Offender Registration Act).  The court also restricted his parole eligibility pending completion of specified sex offender treatment.  Pelletier timely appeals.

**STANDARD OF REVIEW**

¶12    We review evidentiary rulings for an abuse of discretion under the applicable rules of evidence.  *State v. Parker*, 2007 MT 243, ¶ 9, 339 Mont. 211, 169 P.3d 380; *State v.*

*Strauss*, 2003 MT 195, ¶ 18, 317 Mont. 1, 74 P.3d 1052.  An abuse of discretion occurs if a court exercises granted discretion based on a clearly erroneous finding of fact, an erroneous conclusion or application of law, or otherwise acts arbitrarily, without conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice.  *Larson v. State*, 2019 MT 28, ¶ 16, 394 Mont. 167, 434 P.3d 241; *In re D.E.*, 2018 MT 196, ¶ 21, 392 Mont. 297, 423 P.3d 586; *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811.  We review conclusions and applications of law de novo for correctness.  *State v. Christensen*, 265 Mont. 374, 375-76, 877 P.2d 468, 469 (1994).

## DISCUSSION

¶13    *1.   Whether the District Court erroneously allowed the State to cross-examine Pelletier regarding an unsubstantiated 2003 SIWC allegation for the purpose of rebutting his self-serving good character testimony?*

¶14    "All relevant evidence is admissible" unless otherwise provided by law.  M. R. Evid. 402. "Relevant evidence means evidence having any tendency to make the existence of any fact . . . of consequence to the determination of the action more . . . or less probable."  M. R. Evid. 401. "Relevant evidence may include," *inter alia*, "evidence bearing [on] the credibility of a witness or hearsay declarant."  M. R. Evid. 401.  Impeachment evidence is "evidence tending to cast doubt" on the credibility of a witness.  *See State v. Williams*, 2018 MT 194, ¶ 18, 392 Mont. 285, 423 P.3d 596.  *See also* M. R. Evid. 607(a) ("credibility of a witness may be attacked by any party").[4]

---

[4] Credibility is "[t]he quality that makes something (as a witness or some evidence) worthy of belief."  CREDIBILITY, Black's Law Dictionary (11th ed. Westlaw 2019).  In contrast, veracity

9

¶15     M. R. Evid. 404 governs the admission of character evidence, whether offered for impeachment purposes or as substantive evidence of a matter at issue.  Character evidence is:

> [e]vidence regarding [a] [person]'s general personality traits or propensities, [whether] of a praiseworthy or blameworthy nature; evidence of a person's moral standing in a community.

EVIDENCE, Black's Law Dictionary (11th ed. Westlaw 2019).  Generally "synonymous" with "morality," character includes "the sum total of all [of a person's] moral traits, including honesty, fidelity, peacefulness, etc." *State v. Moorman*, 133 Mont. 148, 155, 321 P.2d 236, 240 (1958).[5]  Except as otherwise narrowly provided by an enumerated exception to the rule, evidence of the character, or a character trait, of a party, witness, or hearsay declarant is not admissible for the purpose of proving that the person acted in "conform[ance] therewith on a particular occasion."  M. R. Evid. 404(a).[6]  Even when

---

means "[c]onsistency with the truth[,] accuracy."  VERACITY, Black's Law Dictionary (11th ed. Westlaw 2019).

[5] *See also* 1A John H. Wigmore, Evidence §§ 52 and 55, at 1148 and 1159 (Tillers rev. 1983) (defining character as "the actual moral or psychical disposition or sum of traits," i.e., a "fixed trait or the sum of traits");  Christopher B. Mueller & Laird C. Kirkpatrick, Evidence § 4.11, at 182 (4th ed. 2009) ("character is not a unitary concept: . . . [e]veryone has multiple traits of character");  1 J. Strong, McCormick on Evidence § 195, at 825 (4th ed. 1992) (character is "a generalized description of a person's disposition, or of a disposition in respect to a general trait, such as honesty, temperance or peacefulness").

[6] The general rule of Rule 404(a) and (b) is based on recognition that "persons of bad character are [in fact] more likely to commit crimes than . . . persons of good character" and the resulting need in our constitutional system to have criminal convictions based on evidence that the accused is in fact guilty of the particulars of the alleged crime without consideration of the unfairly corroborating inference that the person is more likely to be guilty based on his or her bad character traits. *State v. Gowan*, 2000 MT 277, ¶¶ 19-20, 302 Mont. 127, 13 P.3d 376 (citing *Michelson v.*

admissible under an enumerated exception to Rule 404(a), character evidence is admissible only in the form specified by M. R. Evid. 405 and 608(b) (in re reputation/opinion evidence and prior acts evidence).

¶16 Rule 404(a) provides enumerated exceptions for limited use of propensity character evidence regarding criminal defendants and witnesses. M. R. Evid. 404(a)(1), (3), and 608.[7] Under the first exception, a criminal defendant may offer reputation or opinion evidence of a personal character trait pertinent to the charged offense or an asserted defense. M. R. Evid. 404(a)(1) and 405(a). Rule 404(a)(1) thus permits a defendant to present evidence that he or she has a pertinent good character trait inconsistent with the alleged offense (*e.g.*, that he or she is honest, trustworthy, has moral integrity, or is a peaceful, non-violent, loving, caring, or law-abiding person) for the purpose of supporting an inference that he or she is not guilty of the offense. *See*, *e.g.*, *State v. Gowan*, 2000 MT 277, ¶ 22, 302 Mont. 127, 13 P.3d 376; *State v. Anderson*, 211 Mont. 272, 292, 686 P.2d 193, 204 (1984); *State v. Jones*, 48 Mont. 505, 516, 139 P. 441, 445 (1914); Commission Comments to M. R. Evid. 404(a)(1) (1976). However, by doing so, the defendant thereby "opens the door" for the State to present otherwise inadmissible cross-examination or extrinsic evidence regarding specific instances of prior conduct relevant to impeach or

---

*United States*, 335 U.S. 469, 475-76, 69 S. Ct. 213, 218-19 (1948), and expounding on various justifications for the general rule).

[7] Rule 404 also provides limited exceptions for use of propensity character evidence to rebut the character of crime victims under certain circumstances and to prove the character or character trait of a criminal defendant where such "is an essential element of a charge, claim, or defense." M. R. Evid. 404(a)(2) and (c).

rebut the subject good character testimony. M. R. Evid. 404(a)(1); *State v. Reinert*, 2018 MT 111, ¶¶ 9-10 and 26-33, 391 Mont. 263, 419 P.3d 662; *State v. Nolan*, 2003 MT 55, ¶ 16, 314 Mont. 371, 66 P.3d 269; *Gowan*, ¶¶ 22-23; *State v. Heine*, 169 Mont. 25, 28-29, 544 P.2d 1212, 1214 (1976); *Jones*, 48 Mont. at 516, 139 P. at 445. Depending upon the circumstances at issue, Rule 404(a)(1) impeachment and rebuttal evidence has two purposes. The first is to rebut and counter the good character propensity inference placed before the jury by the defendant with a basis for a contrary inference. *See* M. R. Evid. 404(a)(1); *Gowan*, ¶¶ 22-24; Commission Comments to M. R. Evid. 404(a) (1976). In the case of a third-party good character witness, the second is to impeach the credibility of the good character testimony by challenging the sufficiency of the witness's basis of knowledge of the defendant. *Moorman*, 133 Mont. at 153-54, 321 P.2d at 239-40 (quoting *Jones*, 48 Mont. at 516, 139 P. at 445, and *State v. Popa*, 56 Mont. 587, 590-91, 185 P. 1114, 1115 (1919)); Commission Comments to M. R. Evid. 404(a) (1976). However, the scope of permissible Rule 404(a)(1) cross-examination or rebuttal evidence is not unlimited—it must be relevant for the Rule 404(a)(1) purpose offered and not unfairly prejudicial. *See* M. R. Evid. 401-03; *Nolan*, ¶ 16 (citing *State v. Eklund*, 264 Mont. 420, 429, 872 P.2d 323, 329 (1994)).

¶17 As a separate propensity character evidence exception applicable to party and non-party witnesses, a party may impeach the credibility of a witness via "opinion or reputation" evidence regarding the witness's character for "untruthfulness." M. R. Evid.

12

404(a)(3) and 608(a).[8]   A party may also cross-examine the witness regarding specific instances of his or her prior conduct for the purpose of impeaching his or her credibility if probative of the witness's character for untruthfulness.  M. R. Evid. 608(b).[9]   However, unlike with Rule 404(1)(a) good character impeachment and rebuttal evidence, a party may not introduce extrinsic evidence to impeach or rebut a witness's character for truthfulness under Rule 608(b).  M. R. Evid. 608(b).  Moreover, by definition, specific instances of prior conduct probative of a witness's character for untruthfulness narrowly include prior instances where the witness lied, made false reports or accusations, or otherwise acted dishonestly, untruthfully, deceitfully, or fraudulently.  *See State v. Frey*, 2018 MT 238, ¶ 20, 393 Mont. 59, 427 P.3d 86; *State v. Cunningham*, 2018 MT 56, ¶ 25, 390 Mont. 408, 414 P.3d 289 (citing *State v. Weisbarth*, 2016 MT 214, ¶ 21, 384 Mont. 424, 378 P.3d 1195).  *See also State v. Martin*, 279 Mont. 185, 198-200, 926 P.2d 1380, 1388-90 (1996) ("certain criminal acts" such as "suppression of evidence, false pretenses, cheating and embezzlement" are probative of "dishonesty" but theft or burglary are not).

¶18    Pelletier first asserts that the State's cross-examination regarding the 2003 SIWC allegation violated M. R. Evid. 404(b).  Consistent with Rule 404(a), M. R. Evid. 404(b)

---

[8] *See* conversely, M. R. Evid. 608 (allowing reputation, opinion, and prior acts evidence bolstering a witness's character for truthfulness under certain circumstances once attacked).

[9] The limited Rule 608(b) right to impeach a witness's character for truthfulness by reference to specific instances of conduct cannot not override, diminish, or effect a waiver of the witness's state and federal constitutional right against self-incrimination.  M. R. Evid. 608(b).  For the purpose of attacking or impeaching the credibility "of another witness as to [whose] character the witness being cross-examined has testified," a party may likewise cross-examine a witness regarding specific instances of the other witness's prior conduct.  M. R. Evid. 608(b).

similarly provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, other acts evidence "may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." M. R. Evid. 404(b). Unlike the propensity character evidence exceptions to Rule 404(a) provided in Rules 404(a)(1), (3), and 608(b), Rule 404(b) does not authorize the use of prior acts evidence for any propensity purpose. Rule 404(b) is no more than a special application of the doctrine of multiple admissibility under which other acts evidence inadmissible for propensity purposes may yet be admissible for a relevant non-propensity purpose. 22B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure: Evidence*, § 5243, 132 (West 2017). Subject to the relevance and unfair prejudice limitations of M. R. Evid. 402-03, Rule 404(b) is merely a contrasting rule of inclusion for prior acts evidence not offered for propensity purposes. *State v. Mont. Eighteenth Jud. Dist. Ct.*, 2010 MT 263, ¶¶ 47 and 56, 358 Mont. 325, 246 P.3d 415; *United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007).

¶19    Here, the District Court admitted the State's cross-examination reference to the 2003 SIWC allegation for the purpose of rebutting Pelletier's good character evidence under M. R. Evid. 404(a)(1), a narrow propensity evidence exception to the general rule of Rule 404(a), which in turn is consistent with the general rule of 404(b). Thus, M. R. Evid. Rule 404(b) does not apply to the prior acts evidence at issue in this case. We hold that the

14

District Court did not erroneously allow the State to cross-examine Pelletier regarding the 2003 SIWC allegation in violation of M. R. Evid. 404(b).

¶20    Tacitly conceding that cross-examination regarding the 2003 SIWC allegation was at least potentially admissible as Rule 404(a)(1) rebuttal evidence, Pelletier next asserts that the District Court nonetheless erred because the 2003 allegation was too remote in time to have significant probative value relative to its inherently prejudicial nature. The State counters that the 2003 allegation was highly probative as Rule 404(a)(1) rebuttal evidence and not unduly prejudicial in light of the single question allowed, the limited nature of the question, and the limiting instruction given. We disagree.

¶21    Like all other relevant evidence, prior acts evidence otherwise admissible under Rules 404(a), (b), or 608(b) is still subject to balancing under Rule 403, to wit:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

M. R. Evid. 403. *See also State v. Gomez*, 2020 MT 73, ¶ 42, 399 Mont. 376, 460 P.3d 926; *Reinert*, ¶¶ 26-34; *Weisbarth*, ¶ 21; *State v. Passmore*, 2010 MT 34, ¶¶ 57-64, 355 Mont. 187, 225 P.3d 1229. District courts have broad discretion under Rule 403 to weigh the probative value of evidence against the relative risk of unfair prejudice, confusion of the issues, or jury distraction. *State v. Stewart*, 2012 MT 317, ¶ 68, 367 Mont. 503, 291 P.3d 1187. Because all relevant evidence is inherently "prejudicial to one side or the other," otherwise relevant evidence is subject to exclusion under Rule 403 only if the risk of prejudice, confusion, or distraction is "unfair," *i.e.* where it is likely to: (1) provoke jury

15

hostility or sympathy for one side regardless of probative value; (2) unduly confuse, mislead, or distract the jury from the central matters at issue in the case; or (3) cause the jury to give undue importance or emphasis to an extraneous prejudicial matter. *State v. Hicks*, 2013 MT 50, ¶ 24, 369 Mont. 165, 296 P.3d 1149 (citing *State v. Huether*, 284 Mont. 259, 265, 943 P.2d 1291, 1295 (1997)); *Passmore*, ¶¶ 63-64.

¶22　In *State v. Kaarma*, 2017 MT 24, 386 Mont. 243, 390 P.3d 609, the wife of a deliberate homicide defendant who shot and killed an apparent burglar who entered his garage though a partially open door was explaining on direct in the State's case-in-chief why she mistakenly believed that the defendant would close the garage door on the night of the shooting. *Kaarma*, ¶¶ 3-4 and 71. Unprompted by the State, the wife gratuitously testified that she assumed he would do so because he was the "protector" of the family. *Kaarma*, ¶ 71. On cross-examination, defense counsel then "specifically elicited additional testimony" from the wife elaborating on her view of his "traditional values . . . meaning that he's supposed to protect me from any danger[,] . . . threat, [or] . . . bad thing." *Kaarma*, ¶ 72. Pursuant to M. R. Evid. 403, the district court precluded the State from asking the wife whether the defendant had previously been *charged* with assaulting her, but allowed the question of whether he had ever assaulted her, to which she replied that he had. *Kaarma*, ¶ 73. On appeal, we affirmed, holding that defense counsel's specific elicitation of additional testimony regarding the defendant's good character opened the Rule 401(a)(1) door, thereby allowing the State "to present other character evidence to rebut it." *Kaarma*, ¶ 76. Rule 403 balancing was not at issue. *See Kaarma*, ¶ 76.

¶23    In *State v. Austad*, 197 Mont. 70, 641 P.2d 1373 (1982), the State charged the

defendant with deliberate homicide, aggravated robbery, SIWC, and aggravated burglary

based on the brutal assault and stabbing death of a 69-year-old woman in her home. *Austad*,

197 Mont. at 76-77, 641 P.2d at 1376. In response to defense counsel's question at trial as

to how the then-amnesiac defendant knew he didn't kill the woman, the defendant

explained:

> I just know what I'm made of, and what I think what I would do . . . [she] was an
> elderly lady, and I wouldn't even think of committing any kind of offense toward
> an old lady or anyone.

*Austad*, 197 Mont. at 87, 641 P.2d at 1383. After the district court ruled that the defendant's

self-serving testimony opened the Rule 401(a)(1) door, the following colloquy ensued

between the State and defendant:

[State]:    How do you know [you didn't burglarize the woman's home]?

[Austad]:   [B]ecause it is not part of me to do that type of thing. I've been in
            trouble with the law before, but I've never burglarized any place.

[State]:    Have you ever been convicted of a felony?

[Austad]:   Yes.

.    .    .

[State]:    What was the conviction for?

[Austad]:   Burglary.

*Austad*, 197 Mont. at 88, 641 P.2d at 1383. On appeal, the defendant asserted that,

regardless of Rule 404(a)(1), the State's cross-examination regarding his prior burglary

conviction violated M. R. Evid. 404(b) and 609. *Austad*, 197 Mont. at 89-90, 641 P.2d at

1384. We affirmed, however, on the grounds that the defendant's self-serving testimony opened the Rule 404(a)(1) good character rebuttal door and that Rules 404(b) and 609 thus did not apply. *See Austad*, 197 Mont. at 89-90, 641 P.2d at 1384. On Rule 403 balancing, we held further that, while "somewhat prejudicial," the questions regarding the prior burglary conviction were highly relevant to show that the defendant's good character testimony was a deliberate lie. *Austad*, 197 Mont. at 90, 641 P.2d at 1384.

¶24 Here, pursuant to M. R. Evid. 404(a)(1), the District Court allowed the State to cross-examine Pelletier regarding an alleged prior bad act for the purpose of rebutting his self-serving good character testimony. However, unlike the prior bad acts in *Kaarma* and *Austad* that were highly probative because those defendants unquestionably committed the prior bad acts and the acts squarely rebutted and contradicted the character testimony at issue, the prior bad acts evidence at issue here is not similarly indisputable and probative for the Rule 404(a)(1) purpose offered. While the truth of an alleged prior bad act is not a necessary requirement for admission as Rule 404(a)(1) rebuttal evidence in every case, the unsubstantiated 2003 SIWC allegation would arguably have had at least some probative value to rebut Pelletier's self-serving good character testimony under the particular circumstances in this case if in fact true. However, the truth of the 15-year-old allegation was not ascertainable without conducting a distracting mini-trial for that purpose within the larger trial of the charged offense. Unlike in *Kaarma* and *Austad,* the unsubstantiated 2003 allegation thus had no non-speculative probative value for the offered purpose of rebutting his asserted good character.

18

¶25 Further, while generally going only to the weight of evidence rather than its admissibility, remoteness in time may nonetheless, depending on the nature of the evidence and purpose offered, diminish the probative value of other acts evidence on Rule 403 balancing. *See State v. Aakre*, 2002 MT 101, ¶¶ 25-29, 309 Mont. 403, 46 P.3d 648; *Martin*, 279 Mont. at 194, 926 P.2d at 1386; *State v. Ray*, 267 Mont. 128, 133, 882 P.2d 1013, 1016 (1994); *State v. Tecca*, 220 Mont. 168, 172-73, 714 P.2d 136, 138-39 (1986). Here, taking the 2003 allegation as true, *arguendo*, the prior incident occurred when Pelletier was a 15-year-old adolescent rather than the mature 30-year-old adult he was at the time of the charged incident in 2018. The significant difference in maturity level between a 15-year-old adolescent and a 30-year-old adult at least significantly diminished any probative value that the 2003 allegation might otherwise have had, if taken as true, as propensity evidence of Pelletier's character in 2018. Thus, unlike the Rule 404(a)(1) rebuttal evidence in *Kaarma* and *Austad*, the unsubstantiated 2003 allegation, even if taken as true, would still at most have had only minimal probative value for the purpose of rebutting or contradicting the truth or accuracy of Pelletier's asserted good character in 2018.

¶26 On the other side of the Rule 403 balance, prior bad acts evidence is highly prejudicial by nature due to the great risk that it will emotionally provoke the jury to desire to punish the defendant for prior bad conduct or, at least, give the prior bad acts evidence undue weight over the actual case-specific evidence of guilt or innocence centrally at issue. *See State v. Madplume*, 2017 MT 40, ¶ 33, 386 Mont. 368, 390 P.3d 142; *Derbyshire*, ¶ 51;

19

*State v. Hansen*, 187 Mont. 91, 99, 608 P.2d 1083, 1088 (1980); Commission Comments to M. R. Evid. 405 (citing McCormick, *Handbook of the Law of Evidence* 443 (2d ed. 1972)). *See also State v. Sage*, 2010 MT 156, ¶¶ 36-37, 357 Mont. 99, 235 P.3d 1284 ("courts must . . . exercise great caution when handling potentially inflammatory propensity or character evidence"). Here, the inherent danger that the jury would give the prior bad acts evidence undue weight over the actual case-specific evidence of guilt or innocence was particularly acute due to the largely, if not exclusively, he-said/she-said nature of the evidence and the fact that the ultimate determination of Pelletier's guilt or innocence thus depended on jury assessment of the relative credibility of the principals' starkly conflicting accounts of the disputed events.

¶27 The State does not dispute the inherently prejudicial nature of the unsubstantiated 2003 SIWC allegation in this case. It instead asserts, *inter alia*, that the limiting instructions given to the jury obviated any danger of *unfair* prejudice for purposes of M. R. Evid. 403. Limiting instructions are indeed generally sufficient to eliminate, or at least reduce, the risk of unfair prejudice where the prior bad acts evidence is both highly relevant and inherently prejudicial. *See State v. Blaz*, 2017 MT 164, ¶ 20, 388 Mont. 105, 398 P.3d 247; *State v. Hantz*, 2013 MT 311, ¶ 44, 372 Mont. 281, 311 P.3d 800. Not so, however, when the probative value of the subject evidence is minimal or non-existent and the relative danger of unfair prejudice is high. *See State v. Franks*, 2014 MT 273, ¶¶ 16-20, 376 Mont. 431, 335 P.3d 725; *Sage*, ¶ 42.

20

¶28 Here, the limiting instructions could not adequately reduce the risk of prejudice to a fair level because the unsubstantiated 2003 allegation had no probative value for the Rule 404(a)(1) purpose offered and the inherent risk of unfair prejudice was high under the particular circumstances of this case. Moreover, the limiting instructions were, in any event, defective for their intended purpose because they incorrectly instructed the jury that the elicited acknowledgment of the 2003 allegation was "evidence that" Pelletier actually "engaged in" the alleged bad act. To the contrary, the acknowledgment of the mere occurrence of the allegation evidenced no more than it *was made*. The fact that the 2003 allegation was made was not probative of whether it was in fact true. The limiting instructions were thus patently deficient for the purpose given in any event. On Rule 403 balancing, the unsubstantiated 2003 allegation had no probative value for the purpose offered and, on the other hand, posed a high risk of unfair prejudice under the circumstances of this case. We hold that the District Court abused its discretion in allowing the State to cross-examine Pelletier regarding the 2003 SIWC allegation under the circumstances of this case.[10]

¶29 *II. Whether the District Court erroneously precluded Pelletier from impeaching the testimony of the State's complaining witness with evidence of marijuana use prior to reporting the alleged offense?*

---

[10] In addition to reliance on M. R. Evid. 404(a)(1) by citation to *Kaarma*, the State further relies on *Reinert*, ¶ 26 (noting permissible Rule 608(b) use of prior acts evidence for impeachment of witness character for truthfulness) as additional justification on appeal. However, the District Court did not rely on Rule 608(b), the State did not offer the subject other acts evidence for that purpose, and the 2003 SIWC allegation was not probative of Pelletier's character for untruthfulness in any event.

¶30 A toxicology screen of M.V.'s blood, drawn incident to her next-day sexual assault examination, revealed the presence of a significant level of tetrahydrocannabinol (THC) indicating recent use of marijuana.[11] The State further candidly acknowledges on appeal that M.V. and her boyfriend ingested concentrated THC tablets, known as "dab[s]," at some point the next morning or afternoon prior to her reporting the alleged offense to police and the sexual assault examiner.

¶31 On the morning of the second day of trial, the court addressed defense counsel's intent to present M.V.'s unredacted toxicology report and testimony from her boyfriend about their next-day marijuana use for the purpose of impeaching the credibility of M.V.'s subsequent accounts of the alleged crime to police and the sexual assault examiner. Defense counsel asserted that M.V.'s marijuana use was relevant to "her demeanor . . . emotions . . . [and] recall" when reporting the alleged offense while "under the influence of marijuana."[12] The State objected on the asserted ground that M.V.'s marijuana use was not relevant to any matter at issue. Sustaining the State's objection, the District Court ruled that, in the absence of qualified expert testimony explaining the physiological effects of marijuana use, M.V.'s marijuana use would not be relevant to impeach her ability to

---

[11] M.V.'s toxicology report measured a blood-THC level of 28 NG/ML of THC-COOH. Compare § 61-8-411(1)(a), MCA (prohibiting operation of non-commercial motor vehicle with a delta-9-THC level of 5 ng/ml or more excluding metabolites).

[12] Defense counsel similarly referenced some "potential testimony that [M.V. and her boyfriend] smoked [marijuana] th[e] night [of the offense] as well." However, based on the limited nature of the non-specific offer of proof and Pelletier's focus on appeal on M.V.'s uncontroverted next-day marijuana use, we limit our analysis to Pelletier's assertion of error regarding M.V.'s marijuana use the next day.

recount the events of the night before. The Court further reasoned that any arguable probative value for that purpose would be substantially outweighed by the likelihood of a "sideshow on marijuana" which would unfairly confuse and distract the jury from the central matters at issue.

¶32 Distinct from the limited permissible uses of propensity character evidence under M. R. Evid. 404(a)(1) and 608(b), any party may attack or impeach the credibility of a witness. M. R. Evid. 607(a). In pertinent part, Rule 607(a) preserves "[t]he traditional [pre-Rules] methods of impeach[ing]" and rebutting witness testimony via cross-examination and extrinsic evidence regarding bias/interest, motive to testify falsely, prior inconsistent statements, contradictory facts, and inability to perceive, recall, or communicate regarding any matter to which the witness testifies. Commission Comments to M. R. Evid. 607 (1976). Thus, subject to the threshold relevance and prejudice standards of M. R. Evid. 401-03, Rule 607(a) distinctly authorizes a broad scope of traditional *non-character-based* witness impeachment evidence. *See Passmore*, ¶¶ 59-63 (discussing non-character-based impeachment by contradiction); *In re Seizure of $23,691.00 in U.S. Currency*, 273 Mont. 474, 480-82, 905 P.2d 148, 152-53 (1995) (distinguishing impeachment of character for truthfulness from non-character-based impeachment of credibility); *State v. Gommenginger*, 242 Mont. 265, 272, 790 P.2d 455, 459-60 (1990) (noting that extrinsic evidence of bias/motive to testify falsely was pertinent to a witness's credibility for truthfulness but not subject to the extrinsic evidence bar of Rule 608 because offered as impeachment evidence directly probative of guilt rather than as propensity

23

evidence regarding witness's character for untruthfulness); *State v. Hayes*, 462 P.3d 1110, 1117-20 (Idaho 2020) (distinguishing Rule 608(b) cross-examination impeachment of character for untruthfulness and extrinsic evidence bar from non-character-based witness impeachment via extrinsic evidence of contradictory facts, bias, or undue influence); 28 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 6118 (2d ed. 2019) (distinguishing permissible Rule 608(b) cross-examination in re witness character for truthfulness from Rule 607 impeachment evidence rebutting/contradicting truth or accuracy of witness testimony). Subject to review for abuse, district courts have broad discretion under M. R. Evid. 401-03 to determine the admissibility of non-character-based impeachment evidence under Rule 607(a). *State v. Polak* (*Polak II*), 2018 MT 174, ¶ 16, 392 Mont. 90, 422 P.3d 112.

¶33 The mere fact that a witness used alcohol or drugs prior to observing, hearing, or relating a disputed event is generally not admissible alone as Rule 607 impeachment evidence. *Polak II*, ¶ 18 (internal citations omitted). However, on a foundation showing that a witness was or appeared to be impaired as a result of use of alcohol or an intoxicating drug at the time of perceiving, recalling, or communicating the events or circumstances at issue, a party may impeach the credibility of the witness under M. R. Evid. 607(a) by cross-examination or extrinsic evidence regarding the witness's use of alcohol or drugs for the purpose of challenging his or her ability to perceive, recall, or communicate those events or circumstances. *Polak II*, ¶¶ 18 and 21-22; *State v. Sorenson*, 190 Mont. 155, 166-67, 619 P.2d 1185, 1191-92 (1980); *State v. Gleim*, 17 Mont. 17, 28-30, 41 P. 998, 1001

24

(1895). Upon additional foundation that the testifying witness denied previously using alcohol or drugs, or being under their influence, at the time of perceiving or communicating the subject event, a party may similarly impeach or rebut the denial, thereby contradicting it and providing a basis for jury inference that the balance of the witness's testimony was inaccurate or untrustworthy. *See Polak II*, ¶¶ 21 and 23; Commission Comments to M. R. Evid. 607 (1976).[13]

¶34    In *Polak II*, the State charged the defendant with deliberate homicide in the shooting death of a romantic rival outside a trailer in which the woman who was the subject of their competing affections was present incident to a cleaning job. *Polak II*, ¶¶ 4-5. Because the woman was the only witness to the shooting and her testimony conflicted with his assertion of self-defense, the defendant sought to impeach her testimony under M. R. Evid 607(a) by cross-examining her about her methamphetamine use and resulting impairment prior to and at the time of the shooting. *Polak II*, ¶¶ 5-6 and 19-22. Following the woman's complete denial at trial of any methamphetamine use on the night in question, the defendant asserted that the evidence of her methamphetamine use was further relevant under Rule 607(a) to "contradict[] her claim she was not high that night, [thus] rendering her a liar and

---

[13] Distinguish M. R. Evid. 608(b) (allowing cross-examination regarding evidence of prior incidents to conduct probative of witness character for untruthfulness to permit propensity inference that witness's subject testimony is dishonest and untrustworthy because witness is a dishonest person) from M. R. Evid. 607 (*inter alia* allowing cross-examination and extrinsic evidence contradicting earlier testimony to allow jury inference that the balance of witness's testimony was similarly dishonest, untrustworthy, or inaccurate). *See, supra, Polak II*, ¶¶ 21 and 23; *Passmore*, ¶¶ 59-63; *$23,691.00 in U.S. Currency*, 273 Mont. at 481-82, 905 P.2d at 152-53; *Gommenginger*, 242 Mont. at 272, 790 P.2d at 459-60; *Hayes*, 462 P.3d at 1117-20; 28 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure* § 6118 (2d ed. 2019).

an untrustworthy witness." *Polak II*, ¶ 21. The contradictory evidence included a meth pipe with residue found at the scene in the trailer on top of her cleaning sponge, an earlier text message on her phone "inviting a friend to 'come smoke'" with her that night, and the victim's post-mortem toxicology report indicating that he "had ingested methamphetamine" before the shooting in an amount "exceed[ing] the average overdose level." *Polak II*, ¶¶ 5 and 10.[14] The district court nonetheless excluded the evidence regarding the woman's methamphetamine use on the stated ground that the defendant failed to make a sufficient foundation showing that she was in fact under the influence of methamphetamine when she witnessed the subject shooting. *Polak II*, ¶ 19. We reversed on appeal and remanded for a new trial, holding that the evidence of the witness's methamphetamine use was relevant for two independent Rule 607(a) purposes—impeachment of the accuracy of her recollection of the shooting and to contradict her testimony denying the use of methamphetamine that night. *Polak II*, ¶¶ 21-23.

¶35 Here, based on M.V.'s toxicology report and the contemplated testimony of her boyfriend who was with her at the time, Pelletier made an offer of proof that, in addition to her asserted inability to fully recall the disputed events of the night and early morning before due to extreme alcohol intoxication, M.V. ingested a THC-concentrated marijuana product that caused her to have a significantly high blood THC level at the time she was

---

[14] The contradictory evidence also ultimately included the defendant's trial testimony that he and the woman had "previously gotten high on methamphetamine together" and that she appeared to be "high on methamphetamine" when he saw her as he approached the trailer just before the shooting. *Polak II*, ¶ 5.

26

reporting the details of the alleged crime to police and her sexual assault examiner. As in *Polak II*, the credibility of M.V.'s recollections and accounts of the disputed events of the alleged crime were the essential crux of the State's case in a largely uncorroborated, classic he-said/she-said case. Coupled with her limited recall of the night and early morning before due to extreme alcohol intoxication, M.V.'s next-day marijuana use prior to reporting the alleged crime to police and her sexual assault examiner, both of whom testified at trial in the State's case-in-chief, was highly relevant Rule 607(a) impeachment evidence under the narrow rule of *Polak II*, *Sorenson*, and *Gleim*.

¶36 We note in passing, *sua sponte*, that *Polak II* factually varied to the extent that a pathologist testified there that "people high on methamphetamine suffer from hallucinations and impaired perceptions[] diminishing the accuracy of memories." *Polak II*, ¶ 22. We find that distinction insignificant here given that the State does not dispute Pelletier's ability to lay the necessary *Polak II* foundation based on the high blood THC level indicated in M.V.'s toxicology screen and the testimony of her boyfriend who was with her at the time.[15] Under the narrow rule of *Polak II*, *Sorenson*, and *Gleim*, neither the State's cursory objection, nor the District Court's stated rationale, were sufficient to justify the blanket exclusion of evidence of M.V.'s next-day marijuana use for the limited Rule 607(a) impeachment purpose offered here. We hold that the blanket, untailored exclusion

---

[15] Similarly undisputed by the State, Pelletier notes as a point of reference on appeal that M.V.'s blood THC level (28 ng/ml) at the time of her next-day reports of the alleged crime was over 5 times higher than the level (5 ng/ml) at or over which it is illegal to operate a non-commercial motor vehicle under Montana law. *See* § 61-8-411(1)(a), MCA.

27

of evidence of M.V.'s next-day marijuana use for the limited Rule 607(a) impeachment purpose recognized in *Polak II*, *Sorenson*, and *Gleim* was an abuse of discretion under the circumstances of this case.

¶37   *III.   Whether Pelletier received ineffective assistance of counsel based on defense counsel's failure to challenge his fitness to proceed and assert a mental disease or disorder defense at trial?*

¶38   The Sixth and Fourteenth Amendments to the United States Constitution, and Article II, section 24 of the Montana Constitution, guarantee criminal defendants the right to effective assistance of counsel. *Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861; *State v. McElveen*, 168 Mont. 500, 501-03, 544 P.2d 820, 821-22 (1975); *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 2063 (1984).  However, the performance of criminal defense counsel is constitutionally ineffective only if both deficient and prejudicial. *State v. Herrman*, 2003 MT 149, ¶ 17, 316 Mont. 198, 70 P.3d 738.  A performance is constitutionally deficient only if it "fell below an objective standard of reasonableness measured [by] prevailing professional norms" under the totality of the circumstances at issue. *Whitlow*, ¶ 20.  *Accord Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065.  A deficient performance is prejudicial only upon a showing of a reasonable probability that the outcome would have been different but for the deficient performance. *Ariegwe v. State*, 2012 MT 166, ¶¶ 15-16, 365 Mont. 505, 285 P.3d 424; *Heath v. State*, 2009 MT 7, ¶ 17, 348 Mont. 361, 202 P.3d 118; *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064.  The performance of counsel is presumed constitutionally effective and a person claiming ineffective assistance of counsel (IAC) bears the heavy burden of overcoming

28

that strong presumption. *Whitlow*, ¶¶ 20-21; *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. The mere fact that defense counsel failed to assert a particular available defense, or take an available defensive action, is generally insufficient alone to establish that the performance of counsel was constitutionally ineffective. *State v. Mahoney*, 264 Mont. 89, 101-02, 870 P.2d 65, 73 (1994).

¶39 Moreover, we generally do not address non-record-based IAC claims on direct appeal. *State v. Fender*, 2007 MT 268, ¶ 9, 339 Mont. 395, 170 P.3d 971; *Hagen v. State*, 1999 MT 8, ¶ 13, 293 Mont. 60, 973 P.2d 233; *In re Evans*, 250 Mont. 172, 173, 819 P.2d 156, 157 (1991). IAC claims are record-based only if the record fully manifests counsel's rationale for the disputed action or inaction. *State v. White*, 2001 MT 149, ¶ 20, 306 Mont. 58, 30 P.3d 340. Because they are not amenable to review on direct appeal, we generally dismiss non-record-based IAC claims on appeal without prejudice to timely postconviction review under Title 46, chapter 21, MCA. *Fender*, ¶ 9.

¶40 Here, Pelletier asserts on various grounds that defense counsel's failure to challenge his fitness to proceed or assert his previously noticed mental disease or disorder defense constituted IAC. However, his IAC claim is a non-record-based claim not amenable to review on direct appeal and in any event moot in light of the balance of this opinion.

**CONCLUSION**

¶41 We hold that the District Court did not erroneously allow the State to cross-examine Pelletier regarding the 2003 SIWC allegation in violation of M. R. Evid. 404(b). However, we hold that the Court did abuse its discretion in allowing the State to cross-examine

29

Pelletier regarding the 2003 SIWC allegation as Rule 404(a)(1) rebuttal evidence under the circumstances of this case. We further hold that the blanket, untailored exclusion of evidence of M.V.'s next-day marijuana use for the limited Rule 607(a) impeachment purpose recognized in *Polak II*, *Sorenson*, and *Gleim* was also an abuse of discretion under the particular circumstances of this case. Based on those prejudicial errors, we hereby reverse Pelletier's SIWC conviction and remand for a new trial. His non-record-based IAC claim is accordingly moot.

¶42     Reversed and remanded for new trial in accordance with this Opinion.


                                                        /S/ DIRK M. SANDEFUR

We concur:

/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON


Justice Jim Rice, dissenting.

¶43     I must disagree with the Court's conclusion under Issue 1, which turns on application of Rule 404(a)(1), M.R.E. The Rule makes admissible evidence of a pertinent trait of character offered by an accused, "or by the prosecution to rebut the same." Then, Rule 405(a) provides that, upon cross-examination, "inquiry is allowable into relevant specific instances of conduct."

¶44     Pelletier took advantage of the Rule, testifying before the jury that he was "not that kind of guy," "would never do that to a female," and had been "slandered" by the sexual

30

intercourse without consent charge filed against him. In response, to rebut Pelletier's character claims, the State sought leave to cross-examine Pelletier about being investigated previously for the same crime—sexual intercourse without consent—in 2003. The District Court permitted a brief and narrow inquiry, one question, accompanied by a cautionary instruction. The Court reverses the conviction for doing so, concluding the prior sexual intercourse without consent investigation was not "indisputable" evidence that Pelletier had committed the prior bad act. Opinion, ¶ 24. Rather, the Court holds that, in order for the State to cross-examine a defendant with prior bad act evidence under Rule 404(a)(1), it must first establish the evidence is "substantiated," or, "in fact, true." Opinion, ¶ 24.[1] Otherwise, a "distracting mini-trial" about the validity of the prior report may ensue. Opinion, ¶ 24.

¶45　I believe the Court's holding is a novel application of Rule 404(a)(1) that is inconsistent with the plain wording of the Rule, as well as our precedent. Never have we interpreted the Rule's scope to permit only prior bad act evidence that is demonstrably "true" based upon a prior conviction, judgment, or other substantiation, beyond the usual foundational and relevance objections. The Rule's language contains no such limitation. The Commission Comments for Rule 404(a)(1) explain, first, that the Rule provides "the accused may introduce evidence of his good character to infer that he did not commit the

---

[1] The Court couches its requirement of substantiation of the truth of prior instances of conduct under Rule 404(a)(1) as applicable only "under the particular circumstances in this case" and not generally applicable "in every case." Opinion, ¶ 24. However, this interpretation of the Rule in a published opinion would arguably be applicable in many, if not all, other cases involving the Rule.

crime, and the prosecution may rebut the same," and that our cases applying the Rule "stand for the proposition that the prosecution may cross-examine the witnesses for the accused concerning rumors or reports concerning the reputation of the accused which would rebut their good character testimony." Among others, the Comments cite to the third-party character evidence case, *State v. Moorman* (1957), 133 Mont. 148, 153, 321 P.2d 236, 239, also cited by the Court, wherein we explained that, "[t]he rule is well settled that, when a defendant in a criminal case calls witnesses to testify that he possesses such a general reputation in the community in which he resides as tends to rebut the notion that he is guilty of the crime with which he is charged, these witnesses may be questioned on cross-examination as to their knowledge of disparaging rumors or common reports affecting his reputation. . . ." Specifically, about the nature of the evidence offered, we explained:

> Naturally the questions must be based on some degree of specificity as to the nature of the conduct or act and when it occurred or else it becomes too vague to answer intelligently. The rule was stated by Parke, B., in Reg. v. Wood & Parker, 5 Jur. 225 (Eng.): "*The question is not whether the prisoner was guilty of that robbery [concerning which his character witness was cross-examined], but whether he was suspected of having been implicated in it*. A man's character is made up of a number of small circumstances, of which his being suspected of misconduct is one."

*Moorman*, 133 Mont. at 154, 321 P.2d at 239-40 (emphasis added). Though the context of general reputation is slightly different than a defendant's own offering that the nature of his character is so above the charge as to be considered slanderous, the rule operates in the same manner. *See State v. Weitzel*, 2000 MT 86, ¶ 25, 299 Mont. 192, 998 P.2d 1154 (to

32

counter Defendant's good character direct testimony, including that he did not own a gun, State permitted to offer that Defendant had pawned and retrieved a handgun.).

¶46 I believe Pelletier's trial involved a classic "opening the door" by Pelletier, and his broadly stated character claim to the jury that he would "never" commit such a crime permitted the State under the Rule to inquire about the prior investigation into his committing the same crime in the past. The District Court narrowly limited the State's inquiry, and gave the jury a cautionary instruction, which we are to presume the jury followed. *See State v. Michelotti*, 2018 MT 158, ¶ 23, 392 Mont. 33, 420 P.3d 1020 (the jury "cannot be presumed to ignore their duties to respect the instructions of the court") (internal citation omitted). I would conclude that the District Court did not abuse its discretion by concluding the evidence was not too remote to counter Pelletier's claim he would "never" commit such an act, and by concluding the prejudicial effect of the evidence did not outweigh its probative value. A defendant should not be able to proclaim his virtuous character is being slandered by the charges with impunity, in the face of appropriate evidence to the contrary. Here, the Court permits Pelletier on re-trial to freely pontificate about his being "slandered" by the charges because he would "never" commit such an act, knowing he is insulated from the State's rebuttal of his testimony by reference to the prior investigation into past similar conduct.

¶47 As for the potential for a "mini-trial," while perhaps not preferable, it is not barred as a matter of law, and a district court will well understand that potential when determining to admit the evidence. Pelletier elected to pursue a character defense, and had multiple

options in response to the State's question: he could have objected to the sufficiency of the foundation; elected not to answer the question under Rule 608 (character testimony by the accused "does not operate as a waiver of the witness' privilege against self-incrimination"); contested the validity of the report; or emphasized that he had been cleared in the investigation. All of these, including the time necessary to contest the validity of the prior bad act, are superior to permitting a litigant to offer a character defense that is shielded from relevant rebuttal evidence.

¶48 I read the Court's analysis under Issue 2 to conclude that, although erroneous, the preclusion of impeachment of the State's witness did not constitute reversible error. I agree with the Court's analysis and this conclusion. Therefore, I would affirm on Issue 1 and affirm the conviction.

/S/ JIM RICE